NONES, DEMANDANTE Y APELANTE, *v.* JUNTA ESCOLAR DE PONCE, DEMANDADA Y APELADA.

APELACIÓN procedente de la Corte de Distrito de Ponce en causa sobre rescisión de contrato y otros extremos.

No. 1447.—Resuelto en marzo 16, 1917.

APRECIACIÓN DE LA PRUEBA—ERROR MANIFIESTO.—Cuando un juez sentenciador llega a la conclusión de que el concreto de unos muros no fué mezclado en las proporciones estipuladas en el contrato, esto es, una parte de cemento, dos de arena y cuatro de cascajo, basado únicamente en que cierto perito dijo que se había mezclado en otras cantidades distintas y dicho perito expone el procedimiento que siguió para obtener los resultados que halló y se prueba y acepta por la corte que cuando se sigue ese procedimiento no se obtienen los volúmenes aparentes en que los materiales se mezclaron sino los absolutos en que aparecen en el concreto, es manifiesto error el llegar a esa conclusión solamente porque dicho perito usó la palabra partes y entender que ésta sólo podía referirse a los volúmenes aparentes cuando puede referirse a los absolutos y más bien se refirieron a éstos toda vez que el perito dijo que siguió ese procedimiento para obtener los volúmenes en que los materiales se hallaban en el concreto.

ID.—CONFLICTO DE ALEGACIONES—FALTA DE CONCLUSIÓN AFIRMATIVA DEL JUEZ SENTENCIADOR.—Habiendo alegado el demandante que el cemento, la arena y el cascajo por él usados, para el concreto de ciertos muros fueron previamente examinados, elegidos y aceptados por el inspector de la parte demandada, y habiendo contestado ésta que la arena y cascajo empleados eran malos y que no fueron aceptados, la resolución del juez de que no ha podido llegar a la conclusión de que dichos materiales fueron malos y que no fueron aceptados previamente a su uso, equivale a estimar no probada la alegación de la demandada en ese extremo, y a declarar que es cierta la contraria que había hecho el demandante, quedando así resuelto el conflicto a favor de éste.

ID.—PREGUNTAS—CONTESTACIONES EN RELACIÓN CON LAS MISMAS.—Si bien es cierto que una persona de instrucción contesta en relación con la pregunta que se le hace y que si se le interroga por las partes en qué se mezcló un concreto su respuesta debe referirse también a esas partes, esto no obstante, si de su propia contestación aparece referirse a otra cosa, no puede sostenerse que contestó en relación con la pregunta.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Antonio F. Castro.*

Abogado de la apelada: *Sr. Libertad Torres Grau, Fiscal del distrito.*

EL JUEZ ASOCIADO SR. ALDREY, emitió la opinión del tribunal.

Como el apelante funda principalmente este recurso en

que la corte inferior cometió manifiesto error en la apreciación de la prueba, error que originó la sentencia que dictó, se hace necesario que hagamos una relación de la cuestión fundamental entre las partes y de las pruebas que se presentaron en el juicio.

La Junta Escolar de Ponce acordó la construcción de un edificio para escuelas en dicha ciudad con el nombre de "Job 63," bajo la inspección y vigilancia del Comisionado del Interior y de sus empleados, y en 15 de julio de 1913 se firmó un contrato entre el presidente de ella, el Comisionado del Interior y Don José A. Bruno por el cual éste se comprometió a construir el edificio por la cantidad de $33,735. Después que Bruno fabricó los cimientos cedió su contrato al ingeniero Don Adolfo Nones en 25 de octubre con el consentimiento de las otras partes del mismo. Dos días después se hizo el Señor Nones cargo de la obra y en 14 de noviembre comenzó a levantar los muros sobre dichos cimientos llegando a colocar tres capas de concreto de unos tres pies de altura cada una comenzando la primera en dicho día, la segunda el día 22, terminándola el 26, y en la tercera empleó desde el 28 hasta el 2 de diciembre en cuyo día recibió orden del superintendente de la obra Señor Nelson, de que suspendiese el trabajo con el concreto por estar blando el de las tres capas que había colocado y dos o tres días después suspendió el contratista toda clase de trabajos en el edificio por haberlo ordenado así dicho superintendente. El Comisionado del Interior hizo examinar los muros y en 8 de enero ordenó al contratista Señor Nones que demoliese éstos por ser blando el concreto y nada satisfactorio para la obra a que se destinaba y que los construyese de nuevo, y habiendo preguntado el Señor Nones si ese trabajo había de hacerse por cuenta suya o por la de la junta escolar se le contestó que por cuenta suya. Manifestó entonces el Señor Nones que no estaba dispuesto a aceptar una responsabilidad que no tenía y en 28 de enero se le hizo saber que si no empezaba a demoler el concreto defectuoso en término de cinco días sería necesario anular el con-

trato. Al día siguiente presentó el Señor Nones la demanda que origina este pleito, la que dirigió contra la Junta Escolar de Ponce y contra el Comisionado del Interior pero después la enmendó eliminando de ella al último.

Los muros fueron derribados en el mes de marzo y la obra seguida sin dicho contratista.

Es un hecho admitido por las partes que el concreto de las tres capas de los muros construídos por Nones estaba blando cuando se le dió la orden de suspender los trabajos y que se partía con las manos, por lo que la cuestión principalmente controvertida en este pleito es si el Señor Nones es culpable o no de tal hecho.

Alegó el Señor Nones, como hechos fundamentales de su demanda interesando la resolución del contrato y que se le paguen determinadas cantidades como indemnización de daños y perjuicios, que todos los materiales que empleó para el concreto de los muros fueron previamente examinados, elegidos y aceptados por el superintendente de la obra Señor Nelson y sus inspectores, quienes intervinieron y presenciaron personalmente todos los trabajos ejecutados en la expresada obra, que en la ejecución de ella cumplió en todas sus partes su contrato y que se ajustó a las reglas y exigencias de la técnica y de la práctica ordinaria usando aparatos y maquinaria de primera clase, haciendo el mezclado y colocación del concreto y su curación con el mayor cuidado y por el tiempo necesario para obtener, como obtuvo, un concreto de superior calidad y de resistencia mucho mayor que la exigida para el edificio y que la orden de demolición de lo construído por él fué completamente arbitraria, contra el dictamen de los ingenieros del Departamento del Interior, inspirada en negligencia y equivocado criterio y con desprecio de sus derechos, que implica mala fe y falta de ejercicio de honrado criterio.

En contestación a esos hechos alegó la demandada que la arena y el cascajo con los cuales el demandante fabricó el concreto de los muros eran malos, que nunca fueron acep-

tados por la persona autorizada por ello por no ajustarse
a lo estipulado en el contrato y en las especificaciones para
la obra y que se advirtió al demandante que no podía usar-
los a menos que los lavara y tamizara y que el demandante
no cumplió con el contrato ni con las condiciones exigidas
en los planos y especificaciones para la obra, ni con los man-
datos de la técnica y la práctica ordinaria y empleó concreto
de calidad inferior a la estipulada que hacía segura la ruina
del edificio.    Formuló también reconvención en la que ale-
gando que Nones no se ajustó al contrato y construyó los mu-
ros con concreto de calidad inferior a la estipulada, que no
los demolió cuando se le ordenó que los construyera de nuevo
a su costa, por lo que hubo de ser hecho el trabajo por el De-
partamento del Interior, que Nones tenía el compromiso de
entregar la obra terminada en 28 de febrero de 1914 y que por
no haberlo hecho tuvo la demandada que alquilar otros edi-
ficios para escuela, y que se había prestado una fianza por
$6,000 para garantizar el cumplimiento del contrato, pidió
que se declarase resuelto el contrato, confiscada la fianza,
y que le pague $480 por perjuicios.

La sentencia que puso término al pleito en el tribunal
*a quo,* declaró sin lugar la demanda y que el demandante no
recobrase cantidad alguna de la demandada, pero declaró
con lugar la reconvención, resuelto el contrato de construc-
ción de Nones con la junta escolar y para responder el con-
tratista de la cantidad de $3,373.50 declaró confiscadas con-
juntamente la fianza que se había prestado en garantía de la
obra y los $1,525.60 valor de los cimientos construídos por
Bruno y por éste cedidos a Nones, quien también fué conde-
nado a pagar a la demandada $480 como indemnización de
perjuicios, más las costas y desembolsos del pleito.

Antes de ser demolidos los muros en cuestión las partes
tomaron bloques de sus tres capas que fueron marcados con
el número 1 el correspondiente a la primera capa colocada
encima de los cimientos; con el número 2 la segunda capa
y con el número 3 la tercera y última.    La parte demandada

envió sus bloques al laboratorio químico de Pittsburg, Pa., recibiéndolos el perito Señor H. H. Craver en tres cajas, conteniendo la marcada con el número 1 el bloque No. 3; la caja No 2 el bloque No. 1 y la caja No. 3 el bloque No. 2. Dicho perito analizó esos bloques de concreto y su dictamen originó una fuerte controversia en el juicio, pues el demandante presentó una prueba abundantísima de peritos para demostrar que las cantidades encontradas por el Señor Craver se refieren a los volúmenes absolutos en que los materiales aparecen en el concreto y no a los aparentes que tenían cuando se hicieron las mezclas por lo que no puede servir de guía para determinar la proporción en que el contratista mezcló el cemento, la arena y el cascajo en el concreto que fabricó y empleó en los muros, y como la corte inferior dictó su sentencia fundándose principalmente en ese dictamen para llegar a la conclusión de que el Señor Nones no había cumplido con el contrato al hacer las mezclas para el concreto, se alega por la parte apelante que la corte inferior cometió manifiesto error al estimar que había obtenido volúmenes aparentes y que las cantidades que obtuvo fueron las en que se proporcionaron los materiales para hacer el concreto.

Debemos hacer constar que según el contrato el Señor Nones debía mezclar una parte de cemento, dos partes de arena y cuatro de cascajo o de piedra picada para hacer el concreto de los muros; que, según la sección 17 de las condiciones generales para la contratación de obras públicas insulares que son parte del contrato, los materiales debían ser examinados y aceptados antes de ser usados; que debían mezclarse en esa obra, como en toda, en volúmenes aparentes, que son los que tienen los cuerpos con cierta cantidad de huecos, que es como se encuentran en el comercio, y que los volúmenes absolutos son los que tienen los cuerpos sin huecos. Si un cajón de un metro cúbico de cabida se llena con cemento, con arena o con cascajo, contendrá un metro cúbico de cemento, arena o cascajo en volumen aparente, pero si esos materiales se reducen cada uno de ellos a una masa com-

pacta y maciza habrán desaparecido sus huecos, su volumen se habrá reducido y tendremos entonces sus volúmenes absolutos, o sea cemento, arena y cascajo sin huecos.

Sentado lo que precede pasemos a considerar si el juez cometió el error que se le atribuye en la apreciación de la prueba.

Según la opinión escrita por el juez sentenciador los motivos que tuvo para dictar su sentencia fueron: que aunque hubo un conflicto en la evidencia respecto a la calidad de los materiales empleados en los muros, especialmente respecto de la arena y del cascajo, por los datos suministrados en el juicio no había podido llegar a la conclusión de que la arena y el cascajo que se emplearon en ellos fueron malos, ni tampoco que dichos materiales no fueron aceptados por el superintendente de la obra y por sus inspectores, pero que, sin embargo, llegaba a la conclusión de que el Señor Nones faltó al cumplimiento de su contrato mezclando o permitiendo que se mezclara el concreto para los muros en proporciones contrarias a las estipuladas, cuyo concreto era de calidad inferior a la convenida y nada propio para el edificio; que no hubo mala fe, negligencia ni falta de ejercicio de honrado criterio por parte de la demandada ni del Comisionado del Interior y que el edificio no fué entregado por el Señor Nones a la Junta Escolar de Ponce dentro del plazo convenido que venció el 28 de febrero de 1914.

Aunque a la afirmación del demandante de que los materiales por él usados para el concreto de los muros fueron previamente examinados, elegidos y aceptados por el Señor Nelson y sus inspectores contestó la demandada alegando que la arena y el cascajo eran malos y que no fueron aceptados por las personas autorizadas para ello, sin embargo, debemos descartar toda consideración sobre este particular ya que el juez resolvió el conflicto a favor del demandante apelante, pues el expresar que no ha podido llegar a la conclusión de que fueron malos y que no fueron aceptados previamente a su uso equivale a estimar no probada la alegación

de la demandada en ese extremo y a declarar que es cierta la contraria que había hecho el demandante. Sobre este extremo no tenemos cuestión ante nosotros.

Después de esto hemos de considerar si hubo o no error en la corte al apreciar que el demandante faltó a su contrato al no hacer las mezclas para el concreto de los muros en las proporciones que estaban estipuladas. Esta es là verdadera contienda entre las partes.

A pesar de que en el juicio declararon los Señores Wright y Miró, inspectores que tenía el Señor Nelson en la obra, que las mezclas de los materiales para el concreto de las tres capas de los muros se hicieron siempre con una parte de cemento, dos de arena y cuatro de cascajo; que de cuando en cuando paraban el mezclado para comprobar si los materiales se usaban en esas proporciones; que en igual sentido declararon otros testigos y de que no fué contradicha ninguna de esas declaraciones, sin embargo, el juez llegó a la conclusión de que las mezclas no se habían hecho en esas proporciones, y por tanto que el Señor Nones había faltado al cumplimiento de su contrato, fundándose únicamente en el dictamen del perito Señor Craver, por entender, y así lo declaró, que las cantidades que obtuvo este perito en su análisis del concreto de los muros fueron volúmenes aparentes, distintos de los del contrato, y que no eran volúmenes absolutos. El apelante sostiene que éste fué el error de la corte.

El perito Señor Craver hizo el análisis químico de tres bloques de concreto correspondientes a las tres capas de los muros; manifestó que no podía decir si la arena era o no limpia ni si contenía cal o arcilla aunque había evidencia de ésta en la masa del concreto, por más que no podía decir si originalmente se encontraba en la arena, siendo los tantos por cientos que encontró los siguientes: en la muestra de la caja No. 1, 1.60 por ciento; de la caja No. 2, 2.28 per ciento, y de la caja No. 3, 1.35 por ciento; tampoco podía decir si el cascajo era limpio, pero sí que en su mayor parte era duro y sólido. Al preguntársele al perito si la prueba y examen

practicado por él en los bloques demostró que la obra de concreto fué proporcionada toda ella en las proporciones de una parte de cemento, dos de arena y cuatro de cascajo, contestó que no lo demostró y que fundado en su análisis calculó las proporciones de los diferentes componentes como sigue:

Bloque No. 1. (Caja No. 2.)
- Cemento, 1 parte
- Arena, 5.7 partes.
- Cascajo, 8.17 partes.

Bloque No. 2. (Caja No. 3.)
- Cemento, 1 parte.
- Arena, 5.48 partes.
- Cascajo, 7 partes.

Bloque No. 3. (Caja No. 1.)
- Cemento, 1 parte.
- Arena, 4.4 partes.
- Cascajo, 4.37 partes.

Repreguntado el perito para que dijese el procedimiento que había seguido para llegar a esas conclusiones, contestó diciendo que tomó una cantidad de cada una de las muestras, las desintegró a mano, golpeándola, lo que continuó hasta conseguir que las partes gruesas del agregado quedaran prácticamente limpias de todo mortero de cemento que estuviera adherido; que la cantidad total del material la colocó entonces en un cedazo que contenía aberturas de un cuarto de pulgada; pesó el material que quedó en el cedazo y lo consideró como agregado grueso o cascajo; que el material que pasó por el cedazo fué tratado con ácido dejando la arena limpia, la que fué secada y pesada; que esto le permitió calcular el tanto por ciento de cascajo, de arena y de cemento que había en las muestras de concreto y que, como los elementos constituyentes del concreto están proporcionados en volúmenes, fué necesario dividir el tanto por ciento en peso de los diferentes ingredientes, obtenidos según ha descrito, por sus gravedades específicas medias para calcular la proporción que, en volumen, se encontraban en el concreto.

Para demostrar la parte demandante que por el procedimiento seguido por el Señor Craver se obtenían los volú-

menes absolutos contenidos en el concreto, pero no los aparentes en que los materiales habían sido mezclados y que por tanto no había contestado la pregunta que se le había hecho referente a partes en volúmenes aparentes, que es como se mezclan en las obras, presentó una abundantísima prueba pericial según la cual la persona que divide los pesos de los cuerpos por sus respectivas gravedades específicas medias obtiene los volúmenes absolutos de los cuerpos, mas no sus volúmenes aparentes. De igual modo declararon los peritos de la parte demandada, y la corte inferior también acepta que esto es así. No obstante esto, declara que el Señor Craver obtuvo volúmenes aparentes y no absolutos como resultado de su análisis químico y para llegar a esa conclusión emplea dos métodos.

El primero de ellos consiste en estimar que como al perito Sr. Craver se le preguntó si el concreto estaba proporcionado en una parte de cemento, dos de arena y cuatro de cascajo, al contestar la pregunta no lo hizo dando volúmenes sino empleando la palabra partes (*parts*), que fué la misma empleada en la pregunta, palabra que en inglés y en español no puede referirse de ningún modo a volúmenes absolutos porque es de sentido común que si una composición, como el concreto, se mezcla en proporción de partes de sus respectivos componentes, esas partes no pueden ser sino volúmenes aparentes de cada material empleado y nunca volúmenes absolutos porque no se hacen las mezclas para el concreto con volúmenes absolutos sino con volúmenes aparentes.

El mero hecho de haber usado el perito la palabra parte en su contestación no es suficiente para poder declarar que se refirió a los volúmenes aparentes en que los materiales del concreto fueron mezclados y de ningún modo a los absolutos encontrados en el cemento, pues aunque puede usarse para expresar las proporciones de los materiales en que un cuerpo, como el concreto, fué construído, sin embargo, empleada con referencia a los materiales encontrados en el cuerpo ya formado parece referirse más bien a los materia-

les que el cuerpo contiene, que son los volúmenes absolutos, que no a aquellos que originalmente se emplearon en su construcción, por lo que no encontramos que el empleo de tal palabra por el Señor Craver demuestre que encontró volúmenes aparentes y de ningún modo volúmenes absolutos.

Es cierto que una persona de instrucción contesta en relación con la pregunta que se le hace y que si se interroga por las partes en que se mezcló un concreto su respuesta debe referirse también a esas partes, pero esto no obstante, si de su propia contestación aparece referirse a otra cosa no puede sostenerse que contestó en relación con la pregunta, y como en este caso el perito Señor Craver, como parte de su contestación, expresó el procedimiento que siguió para el resultado que obtuvo y. como ese procedimiento sólo lleva a obtener volúmenes absolutos, su contestación en partes ha de relacionarse con éstos y no con los aparentes por los que se le preguntó. Es más, el mismo perito habla de que hizo la operación divisoria "para calcular la proporción en que en volumen se encontraban en el concreto," esto es, como sólido, sin huecos, o sea en volúmenes absolutos.

El otro método seguido por la corte fué comparativo y necesita algunos antecedentes.

El demandante declaró como perito que hizo el análisis químico del bloque No. 1. El procedimiento que siguió fué el mismo utilizado por el Señor Craver y mediante él obtuvo los pesos, en 480 gramos, de los materiales de que estaba compuesto el concreto, a saber: cemento, 49.90 gramos; arena, 146.15 gramos; y cascajo, 284 gramos, pesos que reducidos por el perito a la unidad cemento dieron los siguientes: cemento, 1; arena, 2.93; y cascajo, 5.70. El perito Señor Guillermety analizó los bloques No. 2 y No. 3 empleando el mismo procedimiento que Craver y Nones y expresó los pesos que obtuvo para cada uno de los materiales que formaban el concreto. Si también se reducen a la unidad cemento los otros resultados en pesos, esos tres análisis, son los siguientes:

| Bloque No. 1 | Bloque No. 2 | Bloque No. 3 |
|---|---|---|
| (Nones). | (Guillermety). | (Guillermety). |
| Cemento, 1. | Cemento, 1. | Cemento, 1. |
| Arena, 2.93. | Arena, 3.02. | Arena, 3.10. |
| Cascajo, 5.70. | Cascajo, 6.35. | Cascajo, 6.25. |

El demandante quiso hacer ante la corte el análisis químico del bloque número 1 para encontrar ante ella los pesos de los materiales del concreto pero entonces las partes convinieron y aceptaron que, si se hiciera, daría el siguiente resultado en pesos reducidos a la unidad:

*Bloque No. 1.*

Cemento, 1.
Arena, 2.93.
Cascajo, 5.70.

Como se ve, estas cantidades son las mismas que el perito Señor Nones declaró haber encontrado en el análisis que había hecho antes del juicio del bloque No. 1.

El perito Señor del Valle declaró que las gravedades específicas medias se obtienen de los autores y, citando y examinando los admitidos generalmente como autoridades en la materia, escogió como gravedades específicas medias las cantidades de 3.1 para el cemento, 2.65 para la arena y 2.80 para el cascajo, y dividiendo los pesos encontrados en el bloque número 1, que están aceptados por ambas partes, por dichas respectivas gravedades específicas medias obtuvo los cocientes siguientes, o sea, los volúmenes absolutos de los materiales en el concreto:

$$\text{Cemento } \frac{1}{3.1} = 0.322.$$

$$\text{Arena } \frac{2.93}{2.65} = 1.106.$$

$$\text{Cascajo } \frac{5.70}{2.80} = 2.039.$$

Obtenidos así los volúmenes absolutos procedió el Señor

del Valle a encontrar los volúmenes aparentes en que fueron mezclados los materiales en la obra. Para ello adoptó como divisor para el cemento la cantidad de 0.419, para la arena 0.68, y para el cascajo 0.65, como resultado de las explicaciones que dió en la corte, llegando al siguiente resultado:

*Bloque No. 1.*

$$\text{Cemento } \frac{0.322}{0.419} = 0.706.$$

$$\text{Arena } \frac{1.106}{0.68} = 1.623.$$

$$\text{Cascajo } \frac{2.039}{0.65} = 3.137.$$

Estos cocientes reducidos a la unidad cemento dan los siguientes volúmenes aparentes:

*Bloque No. 1.*

Cemento, 1.
Arena, 2.28.
Cascajo, 4.44.

Según nuestra comprobación de esas divisiones el perito sufrió un pequeño error al hacer la división en cuanto al cemento, pues no se obtiene como cociente 0.706 sino 0.768, error que en décimas afecta al resultado final y que sin él es el siguiente:

Cemento, 1.
Arena, 2.11.
Cascajo, 4.10.

Si hacemos las mismas operaciones con los resultados de los pesos de los bloques Nos. 2 y 3 llegaremos a la conclusión de que las mezclas de los tres bloques fueron proporcionadas en volúmenes aparentes así:

| *Bloque No. 1.* | *Bloque No. 2.* | *Bloque No. 3.* |
|---|---|---|
| Cemento, 1 parte. | Cemento, 1 parte. | Cemento, 1 parte. |
| Arena, 2.11 partes. | Arena, 2.18 partes. | Arena, 2.23 partes. |
| Cascajo, 4.10 partes. | Cascajo, 4.56 partes. | Cascajo, 4.51 partes. |

Manifestó el perito que todos esos cálculos son aproximados.

Expuesto lo que precede diremos ahora que el segundo método seguido por el juez consistió en comparar los resultados obtenidos por el Señor Nones en cuanto al bloque No. 1 en volúmenes aparentes con otro de los hallados por el Señor Craver para llegar así a la conclusión, en vista de su poca diferencia de los números del cemento y de la piedra de que el Señor Craver también obtuvo volúmenes aparentes, pero el juez cometió la equivocación de tomar como bloque número 1 de Craver para compararlo con el resultado de Nones en el bloque No. 1, el que estaba en la caja No. 1, siendo así que en ésta se hallaba el bloque No. 3, y, por tanto, comparó el No. 1 con el No. 3 y como los términos de comparación no fueron exactos no puede tomarse ésta en cuenta para sostener que el Señor Craver obtuvo volúmenes aparentes.

No encontramos, pues, fundamento en la corte inferior para sostener la conclusión que halló con respecto a que el Señor Craver obtuvo volúmenes aparentes como consecuencia de su análisis, teniendo en cuenta además que el procedimiento que siguió sólo conduce a volúmenes absolutos, y como no expresó los pesos que obtuvo, ni las gravedades específicas medias que adoptó se hizo imposible en el juicio determinar si .éstas habían sido exactas o no, con arreglo a los autores sobre la materia, y debe prescindirse en absoluto de esas conclusiones.

Además, existiendo una admisión de las partes de que el bloque número 1 daría, si se analizara, determinados pesos los que, mediante operaciones aritméticas y adopción de promedios de gravedades específicas y de tanto por ciento de huecos, llevan a la conclusión de que aproximadamente las mezclas se hicieron en las proporciones convenidas en el contrato, no podía el juez prescindir de esa admisión de hechos entre las partes para dar más valor a un dictamen no aceptado por ambas, fuertemente atacado, que sólo determinaba volúmenes absolutos, sin especificar los promedios adoptados para

poder aquilatar su exactitud, y que estaba en contra de las declaraciones de los mismos empleados del Comisionado del Interior, quien tenía la vigilancia por la demandada del cumplimiento del contrato. Si a esto se agrega que los bloques examinados por el Señor Guillermety también acusan que aproximadamente las mezclas se hicieron de acuerdo con el contrato y que el inspector Miró declaró que al ser suspendida la obra fabricó el Señor Nelson unos pequeños bloques con los materiales que se usaban en ella y en las proporciones del contrato los que resultaron malos y se destruían con los dedos, no puede caber duda alguna de que la causa de la blandura de los muros no se debió a que el contratista no hiciera las mezclas como estaba obligado.

Por todas estas razones entendemos que el juez cometió manifiesto error en la apreciación de la prueba y al declarar, basado únicamente en el dictamen del perito Señor Craver, que el Señor Nones no hizo las mezclas para el concreto de los muros en las proporciones convenidas en el contrato.

Si el estado del concreto de los muros fué producido por el uso de arena sucia, según opinaron los Señores Beardsley y Branch en los dictámenes que rindieron al Comisionado del Interior como consecuencia del examen que hicieron de los muros, entonces no sería responsable de ese hecho el contratista porque los materiales que empleó fueron aceptados por el superintendente de la obra, con mayor razón cuanto que el contratista se quejó a la junta de que se le ordenó emplear arena que no era tan buena como otra que le fué rechazada.

El conjunto de la prueba demostró que se trataba de un concreto de endurecimiento lento cuyo progreso aconsejaba la práctica esperar. Según todos los ingenieros aquel concreto blando debía inspeccionarse por algún tiempo antes de destruirlo para ver si endurecía, pues concretos de endurecimiento lento en obras construídas por los Señores del Valle y Don Rafael Nones llegaron a endurecer y a ser utilizados, ocurriendo lo propio con unas alcantarillas que se construían para obras del Departamento del Interior, las que

llegaron a endurecer y a ser utilizadas, según declaración del Señor Madera. El mismo Señor Beardsley, ingeniero jefe del riego de Guayama, perito de la parte demandada y quien examinó los muros en 16 de diciembre recomendó en su informe al Comisionado del Interior el 22 de diciembre que se continuase la inspección por lo menos otro mes antes de resolver la demolición a fin de observar si había aumentado materialmente en resistencia y que si se podía determinar un suficiente aumento en resistencia entonces la estructura podía ser completada con seguridad. El Comisionado del Interior no siguió este consejo del Señor Beardsley y en 8 de enero siguiente ordenó la destrucción de los muros, cuando ya estaba duro el concreto y podía resistir las capas superiores, según el Señor Skerret, ingeniero del Departamento del Interior.

La ejecución de la obra no solamente fué hecha bajo la inspección del Comisionado del Interior, por sus empleados, sino que según el informe que le rindió el Sr. Branch, se utilizó para ella una mezcladora de primera clase y el concreto fué debidamente colocado. Aunque el demandante no estaba obligado a fabricar concreto de determinada calidad, porque no lo dice su contrato, sin embargo, la prueba física de resistencia de los bloques demostró que el más débil de ellos resistió una presión superior a la que los mismos habían de soportar por pulgada cuadrada, según el cálculo que con los planos hizo el perito Sr. Madera. Nosotros hemos examinado un bloque que nos remitió la corte inferior y que le fué presentado como prueba el día del juicio, y encontramos que por su apariencia está justificado el dictamen que respecto de él dieron los peritos Sres. del Valle y Larrínaga, de ser duro, resistente y que sus componentes no podían separarse con las manos.

Es cierto que el Señor Nones no entregó el edificio terminado en 28 de febrero de 1914, según estaba convenido, pero tal falta de entrega fué motivada por los actos de la demandada ordenándole, por su representante el Comisionado

del Interior, la suspensión de la obra y luego la demolición de los muros y que los construyese de nuevo a su costa, sin suficiente causa para esa determinación. Además, de acuerdo con la sección 15 de las instrucciones a los licitadores, el contratista tenía derecho a una prórroga igual al tiempo de la suspensión.

Como consecuencia de todo lo expuesto se hace necesaria la revocación de la sentencia.

El demandante alegó y la parte demandada admitió que el valor de los cimientos construídos por Bruno, cuyos derechos adquirió, y el de los muros que construyó era el de $5,159.18 que no le ha sido satisfecho; también alegó y la corte inferior declaró probado que su ganancia en el edificio debía ser $4,500, lo que totaliza $9,659.18.

Reclamó también la cantidad de $6,950 por las órdenes que tenía dadas para materiales, pero luego desistió de ella. En cuanto a los $5,067.91 que pidió por el valor de los materiales, herramientas, etc., que tuvo que adquirir para la obra, como estos efectos fueron depositados a su favor por la parte demandada y puede disponer de ellos estimamos que no deben serle pagados.

Debe revocarse la sentencia apelada y dictarse otra declarando resuelto el contrato de 15 de julio de 1913 sobre construcción del edificio escolar de Ponce "Job 63," celebrado entre el Comisionado del Interior, el Presidente de la Junta Escolar de Ponce y Don José A. Bruno, cedido por éste a Don Adolfo Nones; que este demandante recobre de la demandada Junta Escolar de Ponce la cantidad de $9,659.18; declarar sin lugar la reconvención de la demandada, y que cada parte pague sus costas.

*Revocada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Hutchison.